ROSEMARY M. RIVAS (SBN 209147)
**FINKELSTEIN THOMPSON LLP**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Email: rrivas@finkelsteinthompson.com

*Attorney for Plaintiff Elizabeth Chuakay*
*and the Proposed Class*

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH CHUAKAY, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BROCADE COMMUNICATIONS SYSTEMS, INC., LLOYD A. CARNEY, JUDY BRUNER, RENATO A. DIPENTIMA, ALAN L. EARHART, JOHN W. GERDELMAN, KIM C. GOODMAN, DAVID L. HOUSE, L. WILLIAM KRAUSE, DAVID E. ROBERSON, and SANJAY VASWANI,<br><br>Defendants. | Case No.  3:17-cv-58<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Elizabeth Chuakay ("Plaintiff"), by her undersigned attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

### NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this action as a public stockholder of Brocade Communications Systems, Inc. ("Brocade" or the "Company") against the members of Brocade's Board of

Directors (the "Board" or the "Individual Defendants") and Brocade for their violations of Sections 14(a) and 20(a), and Rules 14a-9, 17 C.F.R. 240.14a-9, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4) promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC").  Specifically, the Individual Defendants solicit stockholder approval of the sale of the Company to Broadcom Limited and Broadcom Corporation (together, "Broadcom" or "Parent") through Broadcom's wholly owned subsidiary ("Merger Sub") (the "Proposed Transaction") through a proxy statement that omits material facts necessary to make the statements therein not false or misleading.

2.     On November 2, 2016, the Company announced that it had entered into a definitive agreement (the "Merger Agreement") by which Broadcom, through its wholly owned subsidiary, Bobcat Merger Sub, Inc. ("Merger Sub"), would acquire Brocade through a long-form merger to acquire all of the outstanding shares of Brocade for $12.75 per share in cash (the "Proposed Transaction").  The Proposed Transaction is valued at approximately $5.5 billion.

3.     On December 6, 2016, the Company filed a Preliminary Proxy on Schedule 14A (the "Preliminary Proxy") with the SEC.  On December 20, 2016, the Company filed a Definitive Proxy on Schedule 14A (the "Definitive Proxy") with the SEC.  The Definitive Proxy is materially deficient and misleading because, *inter alia*, it fails to disclose material information about the process leading to the Merger Agreement. Without all material information Brocade stockholders cannot make an informed decision regarding the stockholder vote scheduled for January 26, 2017.  The failure to disclose such material information in a non-misleading way constitutes a violation of §§ 14(a) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed vote in connection with the Proposed Transaction.

4.     For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws. Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages

resulting from the Individual Defendants' violations of these laws.  Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under §§ 14(a) and 20(a) of the Exchange Act, 15 U.S.C. § 78aa. The Court has subject matter jurisdiction pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      The Court has personal jurisdiction over all of the defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. §78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Brocade maintains its principal place of business in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a stockholder of Brocade.

9.      Defendant Lloyd A. Carney ("Carney") is Brocade's Chief Executive Officer and a director of the Company.

10.      Defendant Judy Bruner ("Bruner") has served as a director of the Company since January 2009.

11.     Defendant Renato A. DiPentima ("DiPentima") has served as a Director of the Company since January 2007.

12.     Defendant Alan L. Earhart ("Earhart") has served as a director of the Company since February 2009.

13.     Defendant John W. Gerdelman ("Gerdelman") has served as a director since January 2007.

14.     Defendant Kim C. Goodman ("Goodman") has served as a director of the Company since February 2016.

15.     Defendant David L. House ("House") has served as a director of the Company since February 2004 and Chairman of the Board since December 2005.

16.     Defendant L. William Krause ("Krause") has served as a director of the Company since 2004.

17.     Defendant David E. Roberson ("Roberson") has served as a director of the Company since April 2014.

18.     Defendant Sanjay Vaswani ("Vaswani") has served as a director of the Company since April 2004.

19.     Defendants Carney, Bruner, DiPentima, Earhart, Gerdelman, Goodman, House, Krause, Roberson, and Vaswani are collectively referred to herein as the "Individual Defendants," and the Individual Defendants are sometimes collectively referred to herein as the "Board."

20.     Defendants Brocade and the Individual Defendants are collectively referred to as the "Defendants."

21.     Broadcom, a non-party, is a designer, developer, and supplier of analog and digital semiconductor connectivity solutions.  Broadcom operates primarily in four markets: wired infrastructure, wireless communications, enterprise storage, and industrial.  Broadcom is co-headquartered in Singapore and San Jose, California.

22.     Non-party Merger Sub is a Delaware corporation, a wholly-owned subsidiary

of Broadcom, and a party to the Merger Agreement.

**CLASS ACTION ALLEGATIONS**

23.     Plaintiff brings her claims against the Individual Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Brocade common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

25.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of October 31, 2016, there were approximately 402 million shares of Company common stock issued and outstanding. All members of the Class may be identified from records maintained by Brocade or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

26.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, among inter alia:

(a)     Have the Defendants solicited stockholder approval of the Proposed Transaction with a materially false, misleading and/or incomplete proxy statement;

(b)     Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct; and

(c)     Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

27.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

Plaintiff has retained competent counsel experienced in litigation of this nature.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

29.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**SUBSTANTIVE ALLEGATIONS**

**Background of the Company**

30.     Brocade develops storage area networking ("SAN") and Internet protocol ("IP") products and solutions for businesses and organizations world wide.  The Company provides products and services to telecommunications firms, cable operators, and mobile carriers.  Brocade also sells its products directly to end-users and through its distribution partners.  Brocade was founded in 1995 and is based in San Jose, California.

31.     In a press release dated November 2, 2016, the Company announced that it had entered into the Merger Agreement with Broadcom Corporation, Broadcom Limited and Broadcom Limited's subsidiary, Merger Sub, pursuant to which the Company will be acquired by Broadcom and Brocade stockholders will receive $12.75 in cash for each share of Brocade common stock.  This represents a total equity value of approximately $5.5 billion.

32.     In relevant part, the press release reads:

SINGAPORE and SAN JOSE, Calif., November 2nd, 2016 (GLOBE NEWSWIRE) — Broadcom Limited (Nasdaq:AVGO) and Brocade Communications Systems, Inc. (Nasdaq:BRCD) today announced that they have entered into a definitive agreement under which Broadcom will acquire Brocade, a leader in Fibre Channel storage area network ("FC SAN") switching and IP networking, for $12.75 per share in an all-cash transaction valued at approximately $5.5 billion, plus $0.4 billion of net debt. Broadcom expects to fund the transaction with new debt financing and cash available on its balance sheet. Broadcom, with the support of
Brocade, plans to divest Brocade's IP Networking business, consisting of wireless and campus networking, data center switching and routing, and software networking solutions.

"This strategic acquisition enhances Broadcom's position as one of the leading providers of enterprise storage connectivity solutions to OEM customers," stated Hock Tan, President and Chief Executive Officer of Broadcom. "With deep expertise in mission-critical storage networking, Brocade increases our ability to address the evolving needs of our OEM customers. In addition, we are confident that we will find a great home for Brocade's valuable IP networking business that will best position that business for its next phase of growth."

"This transaction represents significant value for our shareholders, who will receive a 47% premium from the Brocade closing share price on Friday, October 28, 2016, and creates new opportunities for our customers and partners," said Lloyd Carney, Chief Executive Officer of Brocade. "Our best-in-class FC SAN solutions will help Broadcom create one of the industry's broadest portfolios for enterprise storage. We will work with Broadcom as it seeks to find a buyer for our IP Networking business which includes a full portfolio of open, hardware and software-based solutions spanning the core of the data center to the network edge."

Upon closing, the transaction is expected to be immediately accretive to Broadcom's non-GAAP free cash flow and earnings per share. Broadcom currently anticipates that Brocade's FC SAN business will contribute approximately $900 million of pro forma non-GAAP EBITDA in its fiscal year 2018.

The board of directors of Brocade and the Executive Committee of the board of directors of Broadcom have unanimously approved the transaction, which is presently expected to close in the second half of Broadcom's fiscal year 2017 which commenced on October 31, 2016, subject to regulatory approvals in various jurisdictions, customary closing conditions as well as the approval of Brocade's stockholders. The closing of the transaction is not subject to any financing conditions, nor is it conditioned on the divestiture of Brocade's IP Networking business.

**The Process Preceding the Execution of the Proposed Transaction**

33.     On May 19, 2016, representatives of Broadcom met with representatives of Brocade in order to convey their desire to acquire Brocade's fiber channel business.  While no terms were discussed, Broadcom informed Brocade that it hoped to complete such an acquisition "expeditiously."   The two sides discussed scheduling a meeting between the CEOs of the two companies.

34.     On June 2, 2016, a representative of Silver Lake Partners, an investor in Broadcom, met with Defendant Carney in order to discuss various strategic transactions

between Broadcom and Brocade.    During this meeting, Defendant Carney indicated that Brocade's fiber channel business was not for sale.

35.    When Defendant Carney met with the CEO of Broadcom, Mr. Hock E. Tan, later that day, he indicated that Brocade planned to continue its standalone strategy, particularly given its recently completed acquisition of Ruckus Wireless, Inc.

36.    On June 6, 2016, Mr. Tan called Defendant Carney to indicate Broadcom's interest in acquiring Brocade as a whole.  While Defendant Carney noted that the Company was not for sale, he stated that he would bring any unsolicited proposal to the Board. Defendant Carney discussed this call and the previous meeting with the Board in a previously scheduled meeting on July 7, 2016. While the Board agreed with Defendant Carney's initial refusal of an acquisition proposal, it agreed it would consider any unsolicited proposal in line with its fiduciary duties.

37.    On July 14, 2016, Mr. Tan communicated an initial indication of interest via email to Defendant Carney.  This indication of interest lacked any pricing information, but hoped for accelerated, exclusive negotiations.  The Definitive Proxy does not state whether this indication of interest discussed any post-merger plans for the employment of Brocade management.

38.    Later that day, Company management informed the Board of its receipt of the Broadcom initial offer.

39.    On July 20, 2016, the Board met with members of Evercore and its legal advisor, Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini").  The Company, as part of its acquisition of Ruckus Wireless, Inc. and other acquisitions, had recently engaged Evercore and determined to do so again given its familiarity with the Company.  The Board discussed the process it should run to determine the Company's standalone value and as part of an acquisition.

40.    Seemingly unfamiliar with how they should evaluate Evercore's compensation for the engagement, Brocade's CFO, Dan Fairfax, discussed fees with them, and on July 21,

2016, Evercore sent Mr. Fairfax "a summary of past transactions and fees paid to investment bankers for those transactions, for reference."

41.    On July 22, 2016, the Company decided to engage Evercore rather than seek alternative financial advisors.

42.    On August 30, 2016, Defendant Carney met again with Mr. Tan. Defendant Tan stated that it would be prepared to deliver a revised indication of interest on September 14, 2016, including pricing information.

43.    On September 8, 2016, the Company executed a non-disclosure agreement with Broadcom to facilitate due diligence, even before Broadcom provided any pricing information for its offer.

44.    During a meeting on September 12, 2016, the Corporate Development Committee and Defendant Bruner reviewed due diligence materials and a management presentation from Wilson Sonsini and Evercore, providing a preliminary financial analysis of the Company's value based on projections made in September.  Following the meeting, the Corporate Development Company asked Company management to provide due diligence materials to Broadcom before a meeting scheduled for September 14, 2016.  Later that day, Company Management provided the September projections and other diligence materials to Broadcom.

45.    On September 14, 2016, the Company and Broadcom held a due diligence meeting.

46.    On September 15, 2016, Defendant Carney and Mr. Tan met to discuss a potential strategic transaction between the two companies.  Mr. Tan provided a verbal indication of a cash price of $12.00 per share of Brocade common stock.

47.    The Company executed an engagement letter with Evercore on September 16, 2016, formalizing the previous engagement agreement.

48.    Later that day, Broadcom delivered a written non-binding indication of interest at a price of $12.00 per share.  This indication of interest also sought execution of a definitive

merger agreement by October 30, 2016.

49.     That same day, representatives of the Company met with a private equity sponsor, Sponsor A, to discuss Sponsor A's interest in various potential strategic transactions with Sponsor A's portfolio companies.

50.     The next day, the Corporate Development Committee met with Company Management to discuss the September 16th indication of interest.

51.     On September 23, 2016, the Corporate Development Committee met again to discuss potential responses to Broadcom's indication of interest.  During this meeting, the Company identified a list of potential third parties to consider contacting for potential strategic alternatives to a Broadcom acquisition.

52.     The Board met on September 25, 2016 to discuss the potential transaction with Broadcom.  After discussing other potential alternatives and reviewing Evercore's preliminary analysis, the Board directed Defendant Carney to indicate that the offer price of $12.00 was too low to accept.  Later that day, Defendant Carney informed Mr. Tan of this decision, but agreed to additional meetings between the companies to discuss a potential increase in the purchase price.

53.     After a meeting on September 30, 2016 to discuss a potential increase in the purchase price, on October 2, 2016, Defendant Carney informed Mr. Tan by telephone that the Board would not support a transaction at a price below $13.00 per share.  Mr. Tan stated that he could not meet that price, but would take a price of $12.75 to his Board as a best and final proposal.

54.     On October 3, 2016, the Company received a non-binding indication of interest at a price of $12.75 per share in cash as a best and final, seeking a definitive agreement by October 30, 2016.

55.     In a meeting on October 4, 2016, the Corporate Development Committee and Company management met to discuss Broadcom's most recent indication of interest.  During the meeting, the Corporate Development Committee determined that it would recommend

further negotiation at a price of $12.75, but that the Company should reach out to other potential purchasers if it hoped to increase the purchase price.  During a meeting on October 5, 2016, the Board agreed to conduct a solicitation process with an aim of seeking a higher price for the Company.

56.     Company Management and Evercore reached out to eight parties on October 5 and 6, 2016, equally divided between strategic acquirers and four private equity sponsors. Two of the strategic parties immediately said no, while the other two stated they would need to review the opportunity before proceeding.  Each of the private equity sponsors agreed to participate and received non-disclosure agreements.

57.     On October 6, 2016, one of the private equity sponsors, Sponsor B, requested to collaborate as a co-bidder with a strategic acquirer.  The Company agreed on October 7, 2016.

58.     On October 10, 2016, another of the strategic parties declined to participate in the process.  The final strategic acquirer declined on October 13, 2016.

59.     During the week of October 10, 2016, Company management met with the four private equity sponsors to discuss the Company after each had executed non-disclosure agreements

60.     During a meeting on October 15, 2016, the Transaction Committee met and discussed Sponsor B's co-bidder's interest in acquiring the wireless business of the Company, while Sponsor B was interested in the remainder of the Company.   The Transaction Committee then discussed alternatives to selling the entire Company, including a piecemeal approach.  Despite the existing interest of a piecemeal sale to Sponsor B and its co-bidder, the Transaction Committee decided that such a process would be difficult and require a separate solicitation process to find other potential buyers.

61.     On October 15, 2016, one of the private equity sponsors, Sponsor C, indicated that it would bid in the range of $11.00 to $11.50 per share.  Evercore informed Sponsor C that such a price would not be competitive, and Sponsor C indicated that it would like not

increase its bid.  On October 16, 2016, the other private equity sponsor, Sponsor D, indicated that it would not be interested in a strategic transaction with the Company.

62.     On October 18, 2016, Sponsor A submitted a non-binding indication of interest at a price of $11.50 to $12.00 per share.  The same day, Sponsor C submitted an indication of interest at the same price range of $11.50 to $12.00 per share.  Sponsor B informed Evercore that it would not be submitting a bid because such a bid would not provide a meaningful premium to the Company's trading price.

63.     On October 19, 2016, at the direction of the Transaction Committee, Evercore informed Sponsor A and Sponsor C that their proposed prices were too low.  On October 20, 2016, Sponsor A revised its proposed price to $12.25 per share, but warned that a higher price would be difficult.

64.     The Company continued negotiations with the Broadcom throughout this time, including exchanging revisions of a draft merger agreement.

65.     On October 29, 2016, Sponsor A and Sponsor C affirmed their interest in an acquisition of Brocade, but were doubtful that they could support a price above $12.00 per share.

66.     Later that day, the Board met to discuss the ongoing process, and were informed by Evercore that Sponsors A and C would be unlikely to increase their bids above $12.00 per share.

67.     While negotiations continued on October 31, 2016, the Transaction Committee agreed to recommend to the Company Board that Brocade should pay Evercore a discretionary fee contemplated by the engagement.  The Definitive Proxy does not provide the Transaction Committee's reasoning for approving such a payment.

68.     On October 31, 2016, news reports speculated that the Company was subject to potential acquisition, and the trading price increased by roughly $2.00 per share.  The next day, news reports speculated that Broadcom would acquire Brocade and trading prices increased again.

69.     During a meeting on November 1, 2016, the Board reviewed the potential merger.   Evercore presented its financial analysis underlying its fairness opinion, to be provided on November 2, 2016.   The Board approved payment of the discretionary fee to Evercore and unanimously agreed to approve the Merger Agreement.

70.     Before the opening of trading on November 2, 2016, Broadcom and Brocade executed the Merger Agreement and issued a press release announcing the Proposed Transaction.

**The Definitive Proxy Fails to Disclose Material Information**

71.     Defendants filed the Definitive Proxy with the SEC in connection with the Proposed Transaction.   As alleged below and elsewhere herein, the Registration Statement omits material information that must be disclosed to Brocade's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

72.     The Definitive Proxy omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinions and analyses of Brocade's financial advisors.   This omitted information, if disclosed, would significantly alter the total mix of information available to Brocade's stockholders.

73.     Nonetheless, the Definitive Proxy fails to disclose material information and misleads stockholders regarding the Proposed Transaction.   The Definitive Proxy fails to disclose material information concerning the Company's financial projections. First, the Proxy discloses several non-GAAP accounting metrics such as Gross Profit, Operating Income, Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA"), Net Income, and Earnings-Per-Share ("EPS").   However, providing only non-GAAP metrics without disclosing the line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconciling the non-GAAP projections to GAAP measures makes the provided disclosures materially incomplete and misleading.

74.     When a company discloses information in a Proxy that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a

quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

75.     On May 17, 2016, the SEC's Division of Corporation Finance released updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures.  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.  While the Definitive Proxy states that the Directors believe that a reconciliation of each disclosed non-GAAP projection would involve unreasonable effort, the reasoning offered, including quantification of quantifiable measures such as capital expenditures and stock-based compensation, show the flimsy rationale for refusing to provide reconciling disclosures.

76.     Without disclosure of these reconciling metrics, the Definitive Proxy violates SEC regulations and materially misleads Brocade stockholders.

77.     Furthermore, the Definitive Proxy fails to disclose the extent of the conflicts of interest faced by Evercore in providing a fairness opinion used to tout the Proposed Transaction.  The Definitive Proxy states that the Company has engaged Evercore on several other acquisitions in the past two years, including the recent acquisition of Ruckus Wireless, Inc., but fails to either identify the other acquisitions, or disclose any of the compensation paid to Evercore by the Company over the past two years.  By failing to disclose this information, the Registration Statement misleads Company stockholders as to the magnitude of the conflict of interest faced by Evercore. Evercore had motivation to recommend a transaction, no matter the price, because it had a profitable relationship it would not betray.

78.     Evercore faced further conflicts in that it advised Broadcom in the acquisition of Avago Technologies Limited in February 2016.  Made clear by this disclosure, however, is that the Defendants have no valid reason for withholding the compensation paid to Evercore by the Company, or the acquisitions Evercore assisted the Company in completing.

79.     The Definitive Proxy also fails to disclose material information related to Evercore's financial analysis underlying its fairness opinion and the financial projections

provided by Company Management.

80.     With respect to Evercore's *Sum-of-the-Parts Analysis* for Brocade, the Definitive Proxy fails to disclose: (i) the financial figures for each of the examined business segments; (ii) whether EBITDA and Adjusted EBITDA, as used in Evercore's financial analyses, are different and if so, how they differ; (iii) financial projections of unlevered free cash flows for the years 2022 to 2026 for the SRA and Storage Networking component.

81.     Within its description of Evercore's *Sum-of-the-Parts Analysis*, the Definitive Proxy indicates that Evercore was provided with management projections of unlevered free cash flows for the entire Company from November 1, 2016 to October 31, 2026, as well as the terminal value of the Company as of October 31, 2026.  Evercore used these projected values in its discounted cash flow analysis of the SRA and Storage Networking component of the Company.  However, for other business units, including the Storage Networking component, Evercore only used projections through October 31, 2021.  Not only does the Definitive Proxy omit these material financial projections, but also omits Evercore's justification for using five-year projections for some business units and ten-year projections for others.

82.     These omissions of material fact represent selective disclosures made by Defendants in the Definitive Proxy that significantly alter the total mix of information that Defendants used to market the Proposed Transaction.  Defendants misled investors into believing the Proposed Transaction is fair while refusing to disclose the full picture provided to the Board by its financial advisor.

83.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention

## CLAIMS FOR RELIEF

### COUNT I
**Claims Against All Defendants for Violations of § 14(a) of the Securities Exchange Act of 1934**

84.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

85.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

86.     As discussed above, Brocade filed and delivered the Definitive Proxy to its stockholders, which defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

87.     Defendants violated § 14(a) and Rule 14a-9 of the Exchange Act by issuing the Definitive Proxy in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the tender offer commenced in conjunction with the Proposed Transaction. Defendants knew or recklessly disregarded that the Definitive Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     The Definitive Proxy was prepared, reviewed and/or disseminated by defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the tender offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants.

89.     In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of § 14(a) and Rule 14a-9 of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Definitive Proxy, defendants were

aware of this information and their obligation to disclose this information in the Definitive Proxy.

90.     The omissions and incomplete and misleading statements in the Definitive Proxy are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the Definitive Proxy as altering the "total mix" of information made available to stockholders.

91.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Definitive Proxy, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Definitive Proxy, rendering certain portions of the Definitive Proxy materially incomplete and therefore misleading.

92.     The misrepresentations and omissions in the Definitive Proxy are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

**COUNT II**
**Claims Against All Defendants for Violations of § 20(a) of the**
**1934 Act Against the Individual Defendants**

93.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

94.     The Individual Defendants acted as controlling persons of Brocade within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Brocade and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Definitive Proxy, they had the power to influence and control and did influence and control, directly or

indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

95.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Definitive Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

96.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Definitive Proxy contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Definitive Proxy.

97.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

98.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and her counsel as Class counsel;

(B)     declaring that the Recommendation Statement is materially false or misleading;

(C)     enjoining, preliminarily and permanently, the Proposed Transaction;

(D)     in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(F)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 5, 2017

Respectfully submitted

**FINKELSTEIN THOMPSON LLP**

By:     */s/ Rosemary M. Rivas*
Rosemary M. Rivas
One California Street, Suite 900
San Francisco, CA 94111
Tel: (415) 398-8700
Fax: (415) 398-8704
Email: rrivas@finkelsteinthompson.com

*Attorney for Plaintiff Elizabeth Chuakay*

**OF COUNSEL:**

**LEVI & KORSINSKY LLP**
Donald E. Enright (to be admitted *pro hac vice*)
Elizabeth K. Tripodi (to be admitted *pro hac vice*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567
Email: denright@zlk.com

*Attorney for Plaintiff*